## PECOS & N. T. RY. CO. et al. v. SUITOR et al.

(Court of Civil Appeals of Texas. Amarillo. Jan. 4, 1913. Rehearing Denied Feb. 1, 1913.)

1. MASTER AND SERVANT (§ 278*)—ACTIONS FOR INJURIES—SUFFICIENCY OF EVIDENCE.

In an action for the death of a crossing flagman struck by a switch engine, evidence held to support jury's findings that the engineer and fireman were negligent in failing to discover deceased's dangerous position on the track in time to avoid injuring him, and that such negligence was the proximate cause of his death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 952–972, 977; Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 281*)—ACTIONS FOR INJURIES—SUFFICIENCY OF EVIDENCE.

In an action for the death of a crossing flagman struck by a switch engine, evidence held to support jury's finding that he was not guilty of such negligence, contributing to his death, as would defeat a recovery.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 987–996; Dec. Dig. § 281.*]

3. APPEAL AND ERROR (§ 302*)—RESERVATION OF GROUNDS IN REVIEW—MOTION FOR NEW TRIAL—SUFFICIENCY.

Under rules 67 and 68 for district courts (142 S. W. xxii), requiring each ground of motions for a new trial to briefly refer to that part of the ruling or other proceedings complained of, so that the point of objection can be clearly identified and understood, and providing that grounds of objection couched in general terms shall not be considered, the excessiveness of the verdict cannot be reviewed on appeal, where the motion for a new trial merely specified as a ground therefor that it was exorbitant and excessive, without showing wherein it was excessive.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1744–1752; Dec. Dig. § 302.*]

4. DEATH (§ 88*)—ACTIONS FOR CAUSING—ELEMENTS OF DAMAGE.

The damages recoverable by minor children for the death of their father is not limited to the sum which he would probably have contributed to them, but may include damages for loss of his care and moral and mental training.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 116; Dec. Dig. § 88.*]

5. TRIAL (§ 121*)—ARGUMENT OF COUNSEL—SCOPE.

Since parties have a right to be represented by counsel, the courts cannot control their argument if it presents to the jury conclusions supported by facts, either direct or circumstantial, tending to support counsel's theory.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 294–298, 300; Dec. Dig. § 121.*]

6. MASTER AND SERVANT (§ 264*)—ACTION FOR INJURIES—EVIDENCE — ADMISSIBILITY UNDER PLEADINGS.

Where the petition, in an action for the death of a crossing flagman, alleged that his peril was discovered by those operating the engine by which he was struck in time to have avoided the injury by the exercise of ordinary care and the use of the means at hand, evidence that the engine could have been stopped by an angle cock on the rear of the engine was admissible, although there was no specific allegation of negligence in failing to so stop it.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. § 264.*]

7. APPEAL AND ERROR (§ 1050*)—REVIEW—HARMLESS ERROR.

The erroneous admission of evidence was harmless, where other testimony to the same effect was admitted without objection.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

---

8. APPEAL AND ERROR (§ 1052*)—REVIEW—HARMLESS ERROR.

In an action for the death of an employé struck by a train, the erroneous admission of evidence bearing only on the issue of discovered peril was harmless, where that issue was withdrawn from the jury, and the issue of negligence in failing to discover his peril alone submitted.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4171–4177; Dec. Dig. § 1052.*]

9. APPEAL AND ERROR (§ 1033*)—REVIEW—HARMLESS ERROR.

In an action for the death of an employé, the refusal of an instruction that if he was guilty of contributory negligence the damages should be reduced proportionately did not prejudice defendant, where the court charged to find for defendant if deceased was negligent, since the error was favorable to defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4052–4062; Dec. Dig. § 1033.*]

Appeal from District Court, Potter County; J. N. Browning, Judge.

Action by Mrs. Laura Suitor and others against the Pecos & Northern Texas Railway Company and another. From a judgment for plaintiffs, the defendant named appeals. Affirmed.

Terry, Cavin & Mills, of Galveston, and Madden, Trulove & Kimbrough, F. M. Ryburn, and R. E. Underwood, all of Amarillo, for appellant. Barrett & Jones, of Amarillo, for appellees.

HUFF, C. J. The appellees Mrs. Laura Suitor and Hunter Suitor, in their own right, and Laura Suitor as next friend for Myrtle, Nora, Ruby, Johnnie, and Mallory Suitor, minors, as surviving wife and children of J. J. Suitor, brought suit in the district court of Potter county against the appellant, the Pecos & Northern Texas Railway Company, and the Southern Kansas Railway Company of Texas for damages alleged to have been sustained as a result of the negligence of the defendants' employés in charge of a switch engine running over and killing J. J. Suitor, who at the time was acting in the capacity of flagman at the Tenth street crossing in Amarillo, Tex. A trial resulted in a verdict for the appellees in the sum of $15,000 against the Pecos & Northern Texas Railway Company. A verdict was rendered in favor of the Southern Kansas Railway Company of Texas, and that Hunter Suitor take nothing by his suit.

Appellees, for cause of action, among other things, aver that "those operating said engine and tender last aforesaid negligently failed to keep a lookout for the said J. J. Suitor, although they knew, or would have known in the exercise of ordinary care, that he was on said track, and he did not know that said engine and tender were backing towards him." And further alleged: "The defendants' said servants operating said engine and tender running down and killing the said J. J. Suitor were negligent in failing to discover the said J. J. Suitor on said track in time to have avoided running him down, which they could and would have done in the exercise of ordinary care; and such servants were then and there negligent in failing to ring the bell, in failing to blow the whistle, in failing to notify the said J. J. Suitor in any other way of the coming and proximity of said engine and tender; and they were also negligent in failing to keep a lookout, and in failing to discover the said J. J. Suitor in time to avoid running him down; and after the said servants did start to knock him down, and he caught on to said engine, and they dragged him about 100 feet before they seriously injured him, they were negligent in failing to discover his peril and stop said engine after they had knocked him down and before they killed him, which injury and killing could have been avoided by defendants by the exercise of ordinary care, which care they failed to exercise, and which was the proximate cause of said injury; that after the defendants stopped said tender and engine said Suitor was next to and south of the wheel of the tender, and this the said servants knew, and they were negligent in running the said tender south onto said Suitor and killing him; that each and every act of said negligence, separately, was the proximate cause of the death of said J. J. Suitor, and all of said negligent acts taken together were the proximate cause of said death and injury."

There were several other grounds of alleged negligence in the petition, which were not submitted to the jury by the trial court. The trial court submitted only the issue as to whether or not the employés of appellant in charge of the engine were negligent in failing to discover the position of Suitor upon the track in time to prevent the accident and injuries, and whether such negligence, if any, was the proximate cause of the injury and death of Suitor.

[1, 2] The deceased, J. J. Suitor, for whose death damages are claimed by appellees, was employed by the appellant as flagman at the Tenth street crossing in the city of Amarillo, over the railway track of appellant, at which point and on the south line of the street and west of the main passenger track the flagman had his shanty. It is shown to have been his duty to remain at said crossing and warn the traffic crossing on that street of danger, and to notify them when and when not to cross the railway. At the time of his death he was so engaged. At that time there were two switching crews at and near the crossing, known as the Tenth street crew and the Twentieth street crew. The Tenth street crew then had in charge a string of cars on what was known as the main freight track, some eight or ten feet east of the main passenger track, upon which Suitor was killed. This train or string of cars was across and obstructed the Tenth street crossing and at the time prevented passage on the street

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

over the railway tracks. Tenth street ran east and west over and across the railway tracks of appellant. The direction of the railway at that point was practically north and south. Suitor was killed on the main passenger track, which was next to the shanty or station and on what is called the west track, by the switch engine and tender in charge of the Twentieth street crew. This engine and tender had gone north of Tenth street near the depot (the distance is not shown) for water. The engine was headed north. Its place of work was at Twentieth street, some distance south of Tenth street. After getting water it started back south towards the station, traveling on the main passenger track, which ran next to Suitor's station at the south line of Tenth street. In returning it backed onto and across Tenth street. In going south the tender or water tank was in front. At the back or end of the water tank there was a footboard, upon which the switchmen or members of the crew could stand. The engine was equipped with a headlight, both in front and at the rear. At the crossing near Suitor's station there were street lights; the size or power of the lights, or just where placed, the evidence does not designate. Suitor was struck and run down by the switch engine as it was backing to the station somewhere near Suitor's place and injured, from which injuries he died in a few minutes. It was somewhere near 11:55 o'clock p.. m. on the 8th day of April, 1911, when Suitor was struck. At that time there was an auto standing in Tenth street just west of the track, near Suitor's station, waiting for the street to be cleared in order to pass over. A. Molyneaux was in this auto at the time the engine struck Suitor. The above are substantially all uncontroverted facts, but most every other fact is in conflict.

A. Molyneaux testified he was on Tenth street at the railway line, waiting for a train to pass so he could get across the track. When he first noticed the engine and tender which killed Suitor, it was north of the crossing, backing down south. When it got to the crossing, it kept going and did not stop. It was making no more noise than an engine would ordinarily make when in motion. It was his recollection that the bell was not ringing or the whistle blowing. He stated the first he noticed was three lanterns to the southeast of him on the track. He said these three men jumped on the footboard and disappeared, and at the time they did so he heard an outcry, and at the same time the engine came to a stop. He could not say how far the engine ran after he heard the cry. The cry was south of where the road crosses the track. He went to Suitor after the engine stopped, and assisted in carrying him to the flagman's house. When he got to him, Suitor was on the track and south of the flagman's house. This witness, on cross-examination,

testified that the engine was going at a pretty good gait while backing across the street and did not slow down; that he did not hear any whistle blown or notice the bell ringing; and that he was reasonably certain that no bell was rung or whistle blown. He noticed three lanterns together, and did not notice any fourth man with lantern. When three men got on the footboard, they were south of the roadway, standing on the track. The actual travelway of the street was about the center of the street. Almost immediately after they got on the footboard, he heard the exclamation. The engine came to a stop as soon as it could, apparently. The body of Suitor was on the track just after the engine was moved off of it, the head slightly to the east and the feet to the west, and the hip and leg against the west rail. This witness stated, if the deceased ever used a lantern, he did not remember seeing it. He stated he did not know how to estimate the speed the engine was making, and that what made him say it was "going at a pretty rapid gait" was when a train is going across the crossing they usually slow down very slow, and those men standing on the track and staying there. I know it did not usually go that fast. I thought the train was going pretty fast for it to be going down there for them to jump on it. This witness further stated he passed that point every night and saw the deceased at that point when passing, but leaves it in doubt as to whether he saw him before the accident or not that night. At one place the record would seem to indicate that he did see him, while at another he says he did not see him; that it was dark, and all he could see was forms moving around. He does say that he saw only three lanterns, and did not see four lanterns.

A. Huke, the engineer in charge of the engine which killed Suitor, testified that they had been switching up until about 11:30, and then went to the tank at the passenger station for water. The tank was north of Tenth street crossing. "We were coming back, and at the north side of the crossing we barely came to a stop. The switchmen came out from the shanty on the crossing and gave me a back-up signal. I backed up, and they got on the footboard, two of them on my side, and I could see them on the footboard. My side was the right-hand side, and by backing up it was the east side of the engine. They stepped on the footboard, facing the engine, and as they turned around Mr. Iiames and Mr. Lester both jumped off and gave a stop sign. The switchmen were Mr. Iiames and Mr. Lester. Mr. Iiames was a foreman, and Mr. Lester was following the engine. Mr. Waggoner was working in the field. He got on the other side, and I could not see him. They [the switchmen] were close to the south end of the crossing at the time they got on the running board of the engine.

After they got on the footboard, they were on there long enough to turn around. They got on facing the engine, and could not see behind them. They had to turn. At the rate the engine was going at that time, I could hardly say how far it would go. It was only a very short distance when the stop signal was given. I applied the air and stopped. As close as I can come, I think I ran about 10 feet after the signal was given." The condition of the engine, brakes, and appliances for stopping were good at the time. "I think I stopped as soon as it was possible. At the time of the injury there was a headlight behind and a headlight in front. There was no signal given me as I approached the Tenth street crossing until the switchmen walked out into the middle of the track and gave a back-up signal. Mr. Iiames gave a back-up signal. In approaching the crossing the bell was ringing, but the whistle was not blowing." The crossing plank at Tenth street crossing is 47 feet 2 inches. That is the length of the boards. The witness then says: "It is 27 feet from the boards to the point right here." We have concluded what is meant by the "point right here" is the place where Suitor was picked up after the injury; but much of this witness' testimony is wholly unintelligible to this court, for the reason that he appears to have been testifying from a map, and used such expressions as "here," "there," "this point," and the like. The map is not in the record. The witness approximates the distance from the south side of the flagman's shanty to the railway track to be four or five feet. The shanty was six or eight feet wide. The switchmen—the two he saw get on the footboard—were towards the south end of the boards on the crossing at the time he stopped his engine at the north end, and as he advanced they went off of the south end, at which point they got on the footboard. Waggoner and Iiames jumped off a little bit south of the crossing board and gave the stop signal. When he stopped his engine, the cab of the engine was still over the south end of the crossing, and his position a couple of feet from the south end of the crossing. The length of the tank was 22 feet; the back wheel of the tank about 18 inches under the footboard; the hind end of the engine between 20 and 21 feet from the south end of the boards. It is about 27 feet from the south end of the boards on the crossing to the switchstand. In backing from the water tank he saw three or four lamps out on the Tenth street crossing. He did not see any other than three men station themselves to get on the engine, but did not see them after they got on the track, as the tank obstructed his view. He stated he had a view between the freight track and the track he was on, and kept a lookout between the two tracks. He testified after he backed up to the north of the crossing there was no one there, except the switchmen in the middle of the track, and they gave him the back-up signal. If deceased or any other person had been there, he would have seen them. "After night Mr. Suitor was expected to carry a lantern, and every time I saw him he had one." He testified he was going 4 miles an hour when he got the stop signal, and stopped in about 10 feet, and that was the shortest distance in which an engine could be stopped going at that rate of speed. He had only gone about 47 feet from the north of the crossing to the south when he got the signal.

C. O. Wade, the fireman, testified the engine stopped at the north end of the crossing boards, and about the time they stopped he observed four men near the shanty. The way they scattered he thought they were going to get on the footboard, and believed some of them were on the track when he first noticed them. He testified he saw Waggoner, the switchman, give the stop signal, and thought they stopped in five or six feet. He gave the distance or length of the street crossing boards and other distances about the same as those given by the engineer. He said it was his duty to ring the bell, and that he did so before crossing.

G. M. Iiames, who, at the time of the injury, was engine foreman, and as such had charge of the crew at the yardwork, and under his direction, testified he had just gotten on the engine running south, and had just turned around, when he saw Suitor on the track almost at him—within six or eight feet. Before the engine began to back to the water tank, the witness was in the shanty door. Waggoner and Suitor were there. The engine was in view of Suitor and the others. This witness does not remember anything being said in Suitor's presence in regard to getting on the engine. He says: "We walked to the center of the track, and I gave the enginemen a signal to come back. We were in view of Mr. Suitor at the time we approached the engine." He stated that he thought he was six or eight feet to the north of the south end of the crossing board. Lester and Waggoner were with him at that time. "I was facing east when I got on the footboard. We turned around as soon as we could conveniently. I observed Mr. Suitor immediately upon turning around. He was very close to the engine, within six or eight feet of it, and he was near the west rail, between the rails, with his back almost towards it. He would be facing west or south, according to actual directions. His back was towards me; his face was away from the engine when we turned around. When I saw the position he was on the track, I hallooed; 'Look out!' and gave a stop signal about the same instant that I hallooed. I think Mr. Suitor made one step. I would not be positive. I do not know whether the

movement was with his body or with his feet; but he hallooed, 'Save me.' That is the only word I heard. The stop signal I gave is known as 'watch out' among railroad men. The engine moved eight or ten feet before coming to a stop." The body of Suitor was almost opposite the southeast corner of the shanty, on the track.

F. E. Lester testified: As the engine backed up from the water tank, the witness and others walked out of the shanty. Mr. Suitor was with him, and asked if "we knew how long it would be before the Tenth street crew would clear the crossing. They were switching on it at the time. Right about as soon as the engine stopped at the north of the crossing, when we walked out, the foreman, Mr. Iiames, looked at his watch, and he said it was 11:55, and by the time we could get to the yards, the Twentieth street yards, it would be 12 o'clock, and we would turn in for supper." Suitor was present and near enough to have heard the remark. This witness testified as to the position of the parties on the footboard, and as he turned around Suitor was in two feet of the engine and facing it, and Iiames then hallooed, "Look out!" This witness testified the last he saw of Suitor before he and Lester got on the footboard "he [Suitor] was standing in the street about five or six feet from the rails, between the automobile standing in the middle of the street and his own shanty. He had a lantern on his arm. After the accident the lantern was between the rails somewhere. I do not remember where it was exactly. I think it was back about even with the shanty. I saw the lantern; he had it on his arm. He was walking about, and asked when we expected to pull over the crossing."

The appellees placed two witnesses on the stand, who qualified as engineers, and testified an engine and tender, rigged as the one which killed Suitor, running four miles an hour, could be stopped in from one to three feet.

We conclude, in accordance with the verdict of the jury, that the facts were sufficient upon which to base a finding that the servants and employés of appellant were negligent in failing to discover J. J. Suitor's position on the track, before he was struck by the engine, in time to have avoided his injury, and that such negligence was the proximate cause of his injury and death. We further conclude, in accordance with the verdict, that the facts do not show such contributory negligence on the part of Suitor as will defeat a recovery, or negligence on his part contributing to his injury, and that the facts are sufficient upon which to base such finding by the jury. The facts were sufficient to authorize the jury to find negligence on the part of the servants of appellant in failing to discover the deceased on the track. They were approaching the crossing on the street, which was used to such an extent that a flagman was stationed there to warn the traffic of danger at such street crossing. The engine was equipped with a headlight at the back, which must have thrown its light down the track and revealed the person on the track to the engineer and fireman. If the engine stopped at the north end of the crossing boards, the deceased was not over 75 or 100 feet away when they started up, and had they used ordinary care in keeping a lookout they must have observed the perilous position of the deceased, who, the jury must have found, was on the track with his back to the engine. The evidence shows that if such care had been used the engine could have been stopped in from two to ten feet. The engineer says the tender or tank obstructed his view of the west side of the track. The men who got on the running board on the east side must have been immediately behind the tender. He admits he saw them, and saw them turn around. Now, if the west side of the tender was higher than the east side, the evidence does not disclose that fact. Just how he could see directly over the tender and could not see diagonally across the same is not disclosed by the testimony. He certainly could not look out of the cab east, and then around the tender, and see two men on the running board back and south of it. He says he kept a lookout between the track he was on and the freight track east of him. If that is a sufficient compliance with the duty required of him to keep a lookout, placing a headlight on his engine in the front and rear, so as to light the track on which he is running, is useless and unnecessary. If he did not stop at the north of the crossing, as Molyneaux testifies, then all the more should he have kept a lookout for persons on that crossing. He knew the deceased was stationed at that point; and had he used the lights of his engine, the lights on the street, as well as the lantern on the arm of the deceased, he must have discovered the perilous position of the deceased. That the engineer and fireman did not discover the deceased at that time and place in the dangerous position he was on the track, under the facts placed before the jury, we think sufficient to warrant them in finding that such employés were guilty of negligence in failing to so discover him, and that such negligence proximately caused his death.

We think the question as to whether the deceased was guilty of contributory negligence was properly submitted to the jury for their finding. The jury had testimony upon which they could find the bell was not ringing at and before crossing Tenth street, nor the whistles blown. The engineer and fireman testified a bell was ringing, but the whistle was not blown. Molyneaux, who was waiting to cross, and who was observant, testified that he did not notice any bell

ringing or whistle blowing, and that he was reasonably certain they were not. The other witnesses do not testify on that point. It was sought to show that the deceased was notified that the engine was approaching. Lester testified that the foreman, Iiames, looked at his watch as they walked out of the shanty, and while the engine was at the north of the crossing, and stated that it was 11:55, and by the time they got down to the yards it would be 12 o'clock, and that Suitor was near enough to have heard the remark. Iiames says he recollected no such conversation in the presence of Suitor. Lester testified also, as they walked out of the shanty, Suitor was with him, and asked if "we knew how long it would be before the Tenth street crew would clear the crossing." This witness further stated that Suitor "asked when we expected to pull over the crossing." The questions do not appear to have been answered. The jury could have inferred from facts so testified that Suitor did not know of the approach of the engine, and that, in order to ascertain the condition of the train on the freight track, he stepped upon the passenger track, and while his back was to the engine it came at a rapid rate of speed, without ringing the bell or blowing the whistle, and while in the discharge of his duties was taken unawares, run down, and killed through the negligence of the employés of appellant in failing to discover his perilous position. Railway Co. v. Weisen, 65 Tex. 443; Railway Co. v. Sympkins, 54 Tex. 615, 38 Am. Rep. 632; Railway v. Watkins, 88 Tex. 20, 29 S. W. 232; Railway v. Broomhead, 140 S. W. 820; Railway Co. v. Boone (Sup.) 146 S. W. 533. We therefore overrule appellant's first, second, and third assignments of error.

[3, 4] The appellees object to the fourth assignment of error on several grounds, one of which is: "The fortieth paragraph of appellant's motion for a new trial, which forms the basis of this assignment, in that it does not specify wherein or why the verdict is excessive." The ground set up in the motion for new trial, upon which the assignment is based, is: "The verdict of the jury is wholly exorbitant and excessive, and is not based on any lawful proof of measure of damages." We think the objection should be sustained to this assignment. The object and purpose of rules 67 and 68 (142 S. W. xxii) for district courts were evidently designed to enable the court to correct the error, if any, in that court. Certainly the proof offered was lawful as to the measure of damages. It was not shown in the motion for new trial wherein the verdict was excessive. Before the trial court can be charged with error in this court, it must be shown that he made an erroneous ruling. If the facts had been called to his attention in the motion for new trial, showing wherein the verdict was excessive, he could have given a new trial, or a remittitur could have been filed before appeal. Had the motion for new trial been as full as the assignment in this court, it might be there would have been no necessity for the assignment. Rules 68 and 69 (142 S. W. xxii) for district courts; rules 24 and 25 (142 S. W. xii) for Courts of Civil Appeals; Railway Co. v. Fesmire, 150 S. W. 201–203; Railway v. Goodrich, 149 S. W. 1176; Railway Co. v. Matlock, 141 S. W. 1067–1072. If we felt called upon to pass upon the question as to whether or not the verdict was excessive, we could not say that the jury were warranted by the facts in assessing the amount of damages they did. This matter should have been called to the attention of the trial court, pointing out wherein the verdict was excessive, and that court given an opportunity to correct the verdict. In cases of this kind children are not confined to such sum as the father would probably contribute to them. Loss of the care, moral and mental training of the father, which have an appreciable pecuniary value, may be considered in estimating damages. Appellant suggests the father had never earned any more than a bare livelihood; that he was poor, and had been a school-teacher, ginner, farmer, and tax collector, and, lastly, a flagman at the Tenth street crossing in Amarillo. It is urged "the verdict is based upon prejudice, if not upon some secret revenge that some one or more of the jurors held lurking in their bosoms, when they swore they were without bias or prejudice and could render a fair and impartial verdict." There is nothing in the record, aside from the amount of the verdict, which shows such prejudice. The facts in this case show Mr. Suitor to have been attentive to his family, a good instructor, and that he did give his children the benefit of his ability and knowledge, and devoted much of his time to their instruction. It occurs to us the more charitable view to take of the verdict of the jury, and of their motive therefor, is that because of his poverty the pecuniary loss of the value of his moral and mental training to his children was greater than if he had been in better circumstances; and therefore the amount was so fixed. The jury may have been acquainted with that authority from which Judge Neal, in the case of Beaumont Traction Co. v. Dilworth, 94 S. W. 352, quotes, which we have not at hand: "My son, keep thy father's commandments and forsake not the law of thy mother. Bind them continually upon thine heart and tie them about thy neck. Where thou goest, it shall lead thee, and when thou sleepest it shall keep thee; for the commandment is a lamp, and the law is light, and the reproofs of instruction are the way of life." Are not such commandments and instructions from a father "better than gold—yea, than much fine gold?"

[5] The fifth assignment complains of the argument of counsel for appellees. Appellees object to the assignment on several grounds, some of which are well taken; but, as we view the assignment, it should be overruled. The language objected to was: "In my opinion, what killed J. J. Suitor was the act of defendants' employés in permitting the engine to move on south two or three additional feet after the engine had first been brought to a stop, and after they had knocked him down, and when the engine first stopped; but when they released the air and permitted the engine to back on further two or three feet more that is what produced the death of J. J. Suitor." The objection is that there was no evidence at all to support the argument. It appears from an examination of the record that the questions as to when the mortal injury was received by Suitor was discussed and theorized upon, but which, as we view the case, was wholly immaterial. The evidence shows that Suitor's right leg was severed just below the knee and the flesh mashed from the left leg, the hip crushed, and his abdomen torn, so that his bowels protruded. When the engine first stopped, deceased cried out: "It is on my leg. Take it off my leg." The fireman, when he got down out of the cab and went back to Suitor, saw the severed leg between the wheels. It is stated by witnesses that when the air is released the steam in the cylinder will move the engine from six inches to two or three feet, owing to the amount of steam in the cylinder. We think, so far as the evidence from the record shows, that after the first stop of the engine it was not moved south onto Suitor, but backed north off of him. That is our conclusion from the evidence as we understand it. It does not follow, however, that there were not facts upon which appellees could present a different theory. We think there are facts which suggest that the engine did move onto Suitor after the air was released, and counsel was not out of the record in so presenting such theory to the jury. The right to be represented by counsel is guaranteed and preserved, and the courts cannot direct the matter of the argument which presents to the jury conclusions supported by facts, either direct or circumstantial, tending to support such a theory. It is the better practice that counsel refrain from giving their individual opinions to the jury for its consideration. Beaumont Traction Co. v. Dilworth, 94 S. W. 352; May v. Hahn, 22 Tex. Civ. App. 365, 54 S. W. 416. We believe the bill, taken as to this argument, does not comply with the rules, and we approve what is said in Railway Co. v. West, 149 S. W. 206.

[6-8] The sixth assignment complains of the action of the court in permitting the witnesses C. O. Wade, W. C. Catrou, and Pat Stewart to testify with reference to an angle cock on the rear of the engine, and that switchmen could have used the same for the purpose of stopping the engine, because there is no pleading that the failure to use such angle cock was negligence. The pleadings alleged discovered peril, and that such peril was discovered in time, by the exercise of ordinary care and the use of the means at hand, to have avoided the injury. In order to make a case, must the plaintiff allege the equipments of the engine for stopping the engine, where placed and how placed? The facts were peculiarly within the knowledge of the servants of appellant. It occurs to us, when appellees alleged that the servants failed to use the means at hand, that they were charged with the knowledge of the means then possessed by them, and are sufficiently notified of what they are expected to meet. East Line & Red River Ry. Co. v. Brinker, 68 Tex. 500, 3 S. W. 99; Mo. Pac. Ry. Co. v. Hennessey, 75 Tex. 155, 12 S. W. 608. But if there was error in admitting this testimony it was harmless, for the reason A. Huke, the engineer of appellant in charge of the engine, testified to the same facts without objection to his testimony. Insurance Co. v. Maverick, 78 S. W. 560; City of San Antonio v. Talerico, 78 S. W. 28; Metcalfe v. Lowenstein, 35 Tex. Civ. App. 619, 81 S. W. 362. And in the light of the issues submitted to the jury by the charge of the court we think the error, if any, was rendered harmless, as the court withdrew from the consideration of the jury discovered peril and only submitted the issue as to whether there was negligence in failure to discover the peril of Suitor.

The seventh assignment complains of the fourth paragraph of the charge of the court. Without attempting to set out the assignment or the charge, we find, upon careful examination of the same, in connection with the entire charge of the court, given to the jury, that it is not subject to the criticism made. The first, second, and sixth propositions we do not think germane to the assignment or raised by the assignment. The assignment and the propositions thereunder are overruled.

We overrule the eighth assignment, which complains of the fifth paragraph of the court's charge, for the reason that it should be read in connection with the sixth paragraph of the court's charge, which applied the law to the facts; and, further, we do not think it assumes that Suitor was killed while he was in the discharge of his duties, but submitted the question to the jury for their finding.

The ninth assignment is overruled, for the reason we do not think the burden was placed on appellant to prove that it was not guilty of negligence. Especially is this true when viewed in connection with the entire charge of the court.

The seventh paragraph of the court's

charge is complained of in the tenth assignment of error. This charge presents the question of contributory negligence. We think the charge is substantially correct, and is not amenable to the objections presented by the appellant. Railway Co. v. Broomhead, 140 S. W. 823.

The eleventh assignment is overruled, for the reason that the general charge sufficiently presented the issue to the jury sought to be raised by charge No. 2. We think this court could disregard this assignment, as the charge is not set out in the statement or assignment.

[9] The twelfth assignment is overruled. Appellant requested the court to charge the jury that if they found Suitor was guilty of contributory negligence they should diminish the damages in proportion to the amount of negligence attributable to him. The court, in its main charge to the jury, instructed the jury if Suitor was guilty of contributory negligence to find for the defendant. This was against appellees and in favor of appellant, and more favorable to it than the charge requested; and we find, therefore, no injury shown appellant by the refusal thereof.

We think the eighth special requested charge of the appellant, if otherwise correct, is covered by the court's general charge, especially in the fourth, fifth, sixth, and seventh paragraphs thereof; and the thirteenth assignment is therefore overruled.

The trial court only submitted the question of negligence on the part of the employés in failing to discover Suitor, and if they were not negligent in that particular they should find for appellant. We think, therefore, there was no error, as pointed out in the fourteenth assignment, in refusing to give special charge No. 11.

The fifteenth assignment is also overruled, for the reasons stated above, and, in so far as applicable to the question of contributory negligence, was sufficiently covered by the court's charge.

We have reached the conclusion that there is no such error properly presented to this court as requires at our hands a reversal of the case; and it is therefore affirmed.